933 So.2d 9 (2006)
Ingrid PARRY, Appellant,
v.
Timothy PARRY, Appellee.
No. 2D04-2109.
District Court of Appeal of Florida, Second District.
April 28, 2006.
Rehearing Denied June 6, 2006.
*11 Victoria M. Ho and Reuben A. Doupé of Asbell & Ho, P.A., Naples, for Appellant.
Cynthia B. Hall and Mark V. Silverio of Silverio & Hall, P.A., Naples, for Appellee.
NORTHCUTT, Judge.
The dissolution of Ingrid and Timothy Parry's twenty-two-year marriage presented a number of complicated financial issues which, all-in-all, were ably sorted out by the trial judge. We disagree with the final judgment on several points, however, and therefore we reverse it in part.
Most of the issues on appeal concern aspects of the compensation package Tim receives in his employment. After practicing law for a number of years, in 1996 Tim began working for Health Management Associates, Inc. HMA is a publicly traded, Fortune 500 company that maintains its corporate headquarters in Naples. HMA and its subsidiaries own and operate approximately fifty-two hospitals in sixteen states. At the time of the Parrys' divorce, *12 Tim was the company's executive vice president and general counsel.
According to HMA's 1996 Executive Incentive Compensation Plan, the company has fashioned a compensation program aimed at "attracting, retaining, and rewarding high-quality executives . . . and providing such persons with annual and long term performance incentives to expend their maximum efforts in the creation of shareholder value." The plan is administered by a committee that is authorized to make various awards, including awards of restricted company stock and stock options, with sundry terms and conditions relating to time and method for exercise, transferability, and forfeiture.
The trial court had the benefit of deposition testimony from William Schoen, HMA's chairman of the board. Schoen was also chairman of the executive committee, an ex officio member of the compensation committee, and the architect of the compensation plan. He explained that the HMA compensation plan has short-term and long-term components. The short-term compensation includes a base salary and a discretionary cash bonus program. In 2003 and 2004, for example, Tim received a yearly base salary of $250,000 gross. In addition, he had received cash bonuses every year since joining HMA. His 2003 bonus was $242,500 gross. There were also fringe benefits not at issue here.
The long-term compensation scheme comprises awards of company stock options and of shares of restricted company stock. The stock options vest a quarter at a time each year over a four-year cycle. They lapse at the earlier of ten years or the day the recipient ceases to be employed by the company. Tim had been awarded stock options in every year since he began working at HMA. The first grant vested in three years. Each subsequent grant vested according to the schedule described above.
Under HMA's compensation program, an award of restricted stock vests in its entirety on its fourth anniversary, provided the recipient has been continuously employed by the company during the vesting period. If employment is terminated before the fourth anniversary, the stock award is forfeited. Tim was granted stock under these terms in December of every year since he joined HMA. Schoen testified that HMA recently adopted a requirement that its executives hold a certain amount of HMA stock, in Tim's case four times his salary and bonus.
Finally, HMA has a Supplemental Executive Retirement Plan (SERP) that provides key executives with a monthly retirement benefit beginning when the executive reaches the normal retirement date, defined as the later of the executive's attaining the age of 62 or the fifth anniversary of his or her participation in the SERP. The SERP includes a proviso that the executive may not engage in competitive activities during the payment of retirement benefits. If the executive's employment is terminated prior to the normal retirement date, no benefits are paid under the SERP unless HMA's board, in its sole discretion, decides otherwise.
High among Ingrid's complaints on appeal is the trial court's determination that the stock and stock options awarded to Tim as part of his long-term compensation were primarily intended as incentives for his future service to HMA rather than as deferred compensation for past service. But, as we pointed out in Ruberg v. Ruberg, 858 So.2d 1147 (Fla. 2d DCA 2003), determining the primary purpose of an executive compensation plan presents a question of fact. Here, the court was persuaded by such testimony as board chairman Schoen's, which described the long-term *13 compensation plan as "golden handcuffs," chaining the employee to the corporation in the future in order for the employee to realize the financial benefit of the awards, and motivating the employee to enhance shareholder value by giving him a personal stake in the company's future success. The trial court's resolution of this issue was supported by the evidence, and we find no fault in it.
Still, the trial court was mistaken in its determination that Tim's partially earned but unvested HMA stock and stock options were his nonmarital assets. At the time the divorce proceeding was filed, Tim had been awarded 28,756 shares of stock that remained unvested. During the marriage and up to the date of filing, he had been granted options to purchase 384,375 shares. Of these, options to purchase 204,375 shares had vested. During the divorce proceeding Tim exercised an option to purchase 14,200 shares and sold the stock to pay a joint tax obligation and to advance funds to Ingrid, leaving vested options to purchase 190,175 shares.
The trial court properly treated the vested stock and stock options as marital assets and included them in its equitable distribution scheme. But it declared that the stock and options that had been awarded but had not vested during the marriage were Tim's nonmarital property. Thus, even though Tim performed marital labor during the vesting periods of the stock and option grants, Ingrid was not permitted to share in this aspect of the compensation Tim would eventually receive for that labor. This was error.
This court's Ruberg decision examined the distinction between stock and option grants that are given as deferred compensation for past service and those that are awarded as incentive for future service to the employer. It is important to note that this difference in the character of such an award is not the ultimate determinant of whether it is to be classified as marital or nonmarital. Rather, the purpose of determining the character of the award is to assess how much of the asset, if any, is the product of marital labor. See § 61.075(5)(a), Fla. Stat. (2002) (defining "marital assets" to include assets acquired during the marriage). The difference, as a practical matter, is that an award that is in the nature of deferred compensation and that is granted during the marriage is usually a marital asset because it is compensation for past marital labor. On the other hand, an award given as an incentive for future service would be marital only to the extent that the service is thereafter performed before the end of the marriage. In either case, the trial court is charged with identifying and valuing the portion of the award that constitutes a marital asset. See § 61.075(3)(b).
In Ruberg this court determined that the restricted stock and stock options at issue there were given to the husband as incentives for future service. In that case, the awards vested in monthly increments. Consequently, all of the husband's marital labor was reflected in the awards that had vested as of the end of the marriage, and none of the unvested portions of the awards were marital. Because of this, we observed that "[i]t has therefore not been necessary for us to address the appropriate methodology for allocating options that were earned before the applicable cutoff date but remained unvested." Ruberg, 858 So.2d at 1155 n. 2. We noted examples of the "time rule" allocation method employed by courts in California. Id.
Unlike the situation in Ruberg, at the time of the cutoff date in this case there were several outstanding awards to which Tim had devoted marital labor that was yet to be compensated under the vesting *14 schedules. Therefore, it was incumbent on the trial court to allocate and value the marital portions of those awards. While we have found no Florida cases applying a "time rule," the method is essentially the same as the so-called "coverture fraction" applied by Florida courts to value future pension benefits. See Trant v. Trant, 545 So.2d 428, 429 (Fla. 2d DCA 1989). To these unvested assets, the trial court should have applied a formula, whether called a coverture fraction or time rule, to determine the portion earned by marital effort. Accordingly, we reverse the determination that all of the unvested HMA stock and stock options were Tim's nonmarital property.
In Trant, which addressed a husband's pension benefit in a dissolution of marriage proceeding, we explained that the fraction consists of a numerator "that is the amount of time the employee was married while participating in the plan, and the denominator is the total time the employee has in the plan." 545 So.2d at 429. The fraction was to be multiplied by the present value of the pension, the result representing the marital portion to be equitably distributed. Id. But the formula varies depending on the facts of each case. See Diffenderfer v. Diffenderfer, 491 So.2d 265 (Fla.1986). In this case, the numerator should represent the number of months in which marital labor was devoted to earning the award. Here, the numerator would be the number of months between the grant date and the petition filing date. This number will vary because the awards were granted on different dates. (Consistent with our affirmance of the trial court's determination that the awards were for future service, we reject Ingrid's argument that the numerator should include the year prior to the grant date.) The denominator would be the total number of months in which the award was to be earned. Because all of the restricted stock awards at issue have a four-year vesting period, as to those the denominator will always be 48. Determining the denominator for the option grants is less straightforward, because one-quarter of the shares in each option vests every twelve months. Therefore, each grant would entail denominators of 12, 24, 36, and 48, each of which would apply to one-quarter of the shares in the option.
Next, Ingrid takes issue with the trial court's valuation of the marital stocks and options that it included in the equitable distribution scheme and with the court's method of distributing these assets. On the first question, Ingrid argues that the trial court erred by valuing the stock on the petition filing date rather than on the date of trial. See § 61.075(6) (stating that the date for determining the value of marital assets is the date "the judge determines is just and equitable under the circumstances"). The trial court determined the date of filing was the appropriate date to value these assets because their appreciation since then was "active appreciation." It has been said that "[w]hen marital assets have appreciated passively since the filing date, the date of the final hearing generally should be used. When marital assets have appreciated due to the work efforts of either party since the filing date, the filing date should be used." Victoria M. Ho & James Rhett Brigman, A Seven-Step Analysis of Equitable Distribution in Florida Part I: Classification and Valuation of Marital Property, 73 Fla. Bar. J. 62, 67 (May 1999). This proposition may be viewed as the flipside to the rule that the amount of a nonmarital asset's passive appreciation is a nonmarital asset, but the amount of a nonmarital asset's active appreciation is a marital asset. See § 61.075(5)(a)(2); Straley v. Frank, 612 So.2d 610 (Fla. 2d DCA 1992).
*15 While not disputing the legal point, Ingrid argues that the evidence showed appreciation due to market forces, not Tim's efforts. However, Tim presented the testimony of a financial expert with impressive credentials in accounting, public service, the business world, and specifically the health care field. The expert testified that the appreciation in value of HMA's stock was not passive but rather was due in part to Tim's work as a senior officer of the company. See also Lynn Curtis, Valuation of Stock Options in Dividing Marital Property Upon Dissolution, 15 J. Am. Acad. Matrim. Law. 411, 412 (noting that "these high level executives have a direct bearing on the success of the company, so in a very real sense, the increased value of the company's stock is directly attributable to their efforts"). Therefore, we affirm the trial court's exercise of discretion in choosing the date of valuation.
Ingrid also complains of the trial court's decision to value the stock using a discount to reflect the lack of marketability. HMA board chairman Schoen and Tim's financial expert both testified that the stock's value is affected by numerous regulations and restrictions that limit Tim's ability to sell it, warranting the application of a marketability discount. Because the evidence supported application of the discount, we discern no abuse of discretion and affirm on this point. See Williams v. Williams, 683 So.2d 1119 (Fla. 3d DCA 1996) (affirming exercise of court's discretion in applying marketability discount because supported by expert testimony); Miller v. Miller, 662 So.2d 391 (Fla. 5th DCA 1995) (finding no abuse of discretion in trial court's decision not to apply marketability discount when evidence showed that stock was readily marketable).
Neither do we find an abuse of discretion in the trial court's decision to award the stock and stock options to Tim while making offsetting awards to Ingrid. "[T]he methods that the courts have used to effect distribution of the parties' interests are almost as numerous as there are decisions regarding the treatment of options in a divorce." Eric Hollowell, Divorce and Separation: Treatment of Stock Options for Purposes of Dividing Marital Property, 46 A.L.R.4th 640 § 2(a). As noted in the pension cases, there are different ways to effect an equitable distribution of such assets. Generally, the preferable approach entails a reduction to present value, factoring in the contingencies of vesting, maturity, and the pensioner's mortality. Diffenderfer, 491 So.2d at 269 (noting another approach that reserves jurisdiction to order a percentage pay-out upon maturity); see also Trant, 545 So.2d at 429 (comparing immediate offset to deferred distribution). In this case, there were concerns about whether Tim would have the financial ability to exercise the options. Also, the parties' financial needs might diverge in the future, thus, for instance, creating the possibility that Ingrid might need to have Tim sell stock at a time when his status as an insider or other SEC-imposed restrictions prevent him from doing so. Section 61.075(1)(f) requires an equitable distribution scheme to take into account "[t]he desirability of retaining any asset, including an interest in a business, corporation, or professional practice, intact and free from any claim or interference by the other party." Certainly, the circumstances of this case justified the trial court's determination to leave these assets in Tim's hands, and we affirm it. However, because our decision today increases the number of marital options and shares at issue, on remand the court shall not be foreclosed from revisiting the manner in which this property is to be distributed.
*16 In the final issue regarding the compensation package, Ingrid argues that the trial court erred in classifying the SERP as a nonmarital asset. The trial court found that there was no present or marital value to this retirement plan because Tim would receive nothing if he left HMA or was terminated by the company before reaching the age of 62. We disagree and therefore reverse on this issue. The marital efforts here have resulted in a legal career culminating in an executive position that includes a pension benefit subject to certain contingencies. Thus, there is a distributable marital component to the pension benefit even though it is neither vested nor matured at this time. See §§ 61.075(5)(a)(4), 61.076(1) (providing that all nonvested retirement or pension benefits accrued during the marriage constitute a marital asset); Diffenderfer, 491 So.2d at 266-67 (rejecting contention that pension cannot be marital asset when there are contingencies and problems in valuation); Gingola v. Velasco, 668 So.2d 1054 (Fla. 2d DCA 1996) (recognizing marital component in nonvested pension husband might earn if he remains in a state job that he accepted shortly before dissolution proceedings). On remand we leave to the parties to argue, and the trial court to determine, the appropriate coverture fraction. See Trant, 545 So.2d 428.
In addition to the equitable distribution concerns, Ingrid has raised some support-related issues, most notably the trial court's failure to consider Tim's bonus income. Section 61.08(2)(g) requires a court to consider all sources of a party's income when computing alimony, and section 61.30(2) requires a court to include bonuses when calculating child support. The trial court excluded the bonuses because it found that the payments and amounts were contingent and outside of Tim's control. True enough, but it was undisputed that Tim has received a sizable bonus in every year of his HMA employment. Where, as here, bonuses are regular and continuous, it is an abuse of discretion to exclude them from consideration when making support awards. See Shrove v. Shrove, 724 So.2d 679, 682 (Fla. 4th DCA 1999).
The trial court's failure to give consideration to the bonus income did not affect the alimony determination. The court awarded permanent periodic alimony in an amount that was consistent with its findings regarding the marital standard of living and Ingrid's capacity for self-support, both of which were supported by the evidence. But the guidelines child support awarded by the court for the parties' three children was necessarily affected by the exclusion of the bonus income. Therefore, we reverse the child support determination and remand for recalculation under the guidelines with this income factored in.
We also reverse the child support award to the extent that the final judgment ordered an automatic one-third reduction when the oldest child became emancipated upon his graduation from high school, which was anticipated to occur approximately one month after entry of the final judgment. Child support awards must be based on the statutory guidelines. § 61.30; see Donsky-Levine v. Levine, 658 So.2d 1023 (Fla. 4th DCA 1995) (reversing fifty percent reduction of child support when first child reaches majority and remanding for determination of child support required under statutory guidelines when only one child remains at home).
Finally, we affirm the trial court's characterization of the parties' parental status. Ingrid argues that the trial court's designation of the parties as co-primary residential parents established rotating custody without making the proper findings. However, the visitation schedule does not *17 reflect a rotating custody arrangement. Rather, from our review of the record and the final judgment, it appears to us that the characterization was intended to facilitate the children's school choices given the different locations of the parents' residences.
In sum, we reverse the classification of Tim's partially earned but unvested HMA stock and stock options and his retirement plan as Tim's nonmarital property, and we remand for proceedings to allocate, value, and distribute the marital portions of those assets. We reverse the child support award and remand for proceedings to recalculate it under the statutory guidelines with Tim's bonus income factored in. We affirm the judgment in all other respects.
Affirmed in part, reversed in part, and remanded.
SILBERMAN and VILLANTI, JJ., Concur.